# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-337V

| | |
|---|---|
| HENRY RICCI,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: August 26, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On March 29, 2022, Henry Ricci filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine received on November 20, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to damages, and their dispute was therefore submitted to resolution at a "Motions Day" proceeding on August 22, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of $142,344.98 ($140,000.00 for past pain and suffering, plus two damages components not in dispute: $268.78 for unreimbursed expenses, and $2,076.20 for lost wages).**

## I. Procedural History

The case was assigned to SPU in June 2022. ECF No. 9. In May 2023, Respondent conceded entitlement in a Rule 4(c) Report. ECF No. 16. I issued a Ruling on Entitlement on May 2, 2023. ECF No. 17.

On April 8, 2024, the parties reported that they had reached an impasse in attempting to informally resolve damages. ECF No. 29. I ordered the parties to brief their respective positions on the damages issue. Petitioner filed her brief on September 16, 2024, Respondent filed his response brief on October 31, 2024, and Petitioner filed a reply brief on November 15, 2024. ECF Nos. 36 (Pet'r Br.), 38 (Resp't Br.), 39 (Pet'r Reply Br.). On August 22, 2025, I held an expedited hearing to resolve damages.

At the end of the expedited hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed on the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

## II. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I-II of *Ashcraft v. Sec'y of Health & Hum. Servs.*, No. 23-1885V, 2025 WL 882752, at *1-4 (Fed. Cl. Spec. Mstr. Feb. 27, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

### III. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Petitioner was 58 years old at the time that he received the flu vaccine and was self-employed as a certified public accountant. Ex. 1 at 1; Ex. 9 at 2. Petitioner's medical history included obesity, a bicep tendon rupture, and a right rotator cuff repair. Ex. 2 at 46, 127-128, 208; Ex. 4 at 10.

Petitioner received the flu vaccine on November 20, 2020 at an appointment with his primary care physician ("PCP"), Dr. Jay Malickel. Ex. 1 at 1; Ex. 4 at 2. On December 3, 2020, Petitioner went to the emergency room at Inspira Medical Center complaining of tingling in his hands and feet and trouble walking for the past five days. Ex. 2 at 208. Petitioner was found to have decreased reflexes, ataxia, and paresthesia in the upper and lower extremities. *Id.* at 209-210. Petitioner was admitted to the hospital and received steroids. *Id.* at 225. He also underwent an MRI, a CT scan of his brain, and an EKG.[4] *Id.* at 212, 225. After further examinations by an orthopedist and a neurologist, Petitioner was diagnosed with GBS. *Id.* at 231.

On December 4, 2020, Inspira Medical Center transferred Petitioner to the University of Pennsylvania Hospital ("UPH") due to his need for a higher level of care. *Id.* at 192, 231. At the time of transfer, Petitioner reported that the tingling had significantly subsided, but he was still experiencing weakness and a lack of reflexes. Ex. 5 at 20-22.

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[4] Petitioner's mercury levels were also tested because he reported eating a can of sardines every day, but were deemed normal. Ex. 5 at 208, 381.

He also was unable to stand or walk without assistance. *Id.* at 22.

While at UPH, Petitioner had another MRI, a lumbar puncture, and an EMG/NCS test. *Id.* at 33-35, 51, 173, 371. The results of the lumbar puncture and EMG confirmed GBS. *Id.* at 33-35. Petitioner then received a five-day course of IVIG. *Id.* at 54. Petitioner reported improvement after the IVIG. *Id.* at 15. He was also prescribed gabapentin. *Id.* at 15. Petitioner received inpatient physical therapy ("PT") and occupational therapy ("OT") services.[5] *Id.* at 123-124, 130, 136, 140. The therapists recommended that Petitioner be transferred to facility where he could receive more than three hours of therapy per day. *Id.* at 124, 130; *see also id.* at 26.

On December 11, 2020, UPH discharged Petitioner to Encompass Health Rehabilitation Hospital ("Encompass") for inpatient rehabilitation. Ex. 3 at 109-165, 285; Ex. 5 at 13. At discharge, Petitioner was reported to have significantly improved his strength and sensation but still had facial weakness. Ex. 5 at 15. Petitioner received extensive PT and OT (two sessions per day) and also speech therapy at Encompass. Ex. 3 at 93-94, 163, 500-548; Ex. 9 at 2. The medical staff at Encompass noted that Petitioner had improved remarkably well in a short period of time and that his lower extremity strength and sensation had "improved dramatically." Ex. 3 at 250.

Petitioner was discharged home on December 17, 2020. Ex. 3 at 109-111. Petitioner reported that he was "80% better" since admission. *Id.* at 163. Petitioner's discharge summary noted diminished sensations, mild weakness persisting in the lower extremities and the right side of his face, and hypertension. *Id.* at 162-163.

On December 21, 2020, Petitioner received an in-home examination by a nurse through a home health care service. Ex. 10 at 21. The nurse described that Petitioner needed assistance to walk and for certain activities like putting on/taking off footwear, dressing, and bathing. *Id.* at 26, 31. The nurse assigned him "homebound" status because he needed assistance to go out. *Id.* at 35.

On December 22, 2020, Petitioner had an appointment with Dr. Malickel to follow up on his hospitalization. Ex. 4 at 13. Petitioner reported improvement, but was still experiencing right-sided facial weakness and hypertension. *Id.* Petitioner also used a cane due to balance issues. *Id.* Dr. Malickel increased Petitioner's blood pressure medication and recommended continued PT. *Id.*

On December 29, 2020, Petitioner received an in-home PT session through the

---

[5] Petitioner also developed symptoms of syndrome of inappropriate antidiuretic hormone secretion and had to be placed on fluid restrictions. *Id.* at 71, 83.

home healthcare service. Ex. 10 at 43. The physical therapist stated that Petitioner had decreased lower extremity strength and decreased balance. *Id.* Petitioner also had difficulty leaving the house due to exit stairs. *Id.* Petitioner participated in one more in-home PT session on January 5, 2021. *Id.* at 53.

On January 22, 2021, Petitioner had a follow-up appointment with Dr. Malickel. Ex. 4 at 6. Petitioner reported feeling 95% back to baseline but still had mild soreness in his legs after PT and ongoing right-sided facial weakness. *Id.* at 16. Petitioner stated that he had weaned off his medications and had returned to work. *Id.*

Petitioner had a follow-up visit with a neurologist on April 19, 2021. Ex. 7 at 2. Petitioner reported residual tingling in his left finger tips, occasional sharp arm pain, mild facial asymmetry, and increased tearing in his right eye. *Id.* He also stated that he had developed aching in his thighs before the appointment, but this had resolved after taking gabapentin for four days. *Id.* The neurologist noted that Petitioner had mild right-sided facial weakness but normal gait. *Id.* at 1, 3. The neurologist also stated that Petitioner had almost completely recovered from his GBS. *Id.* at 1.

On July 13, 2021, Petitioner returned to Dr. Malickel for pre-operative clearance for an unrelated thyroidectomy. Ex. 8 at 1. Petitioner again reported improvement of his GBS symptoms but still experienced occasional tingling in his hands and feet, a poking sensation in his elbow and thigh, and mild right-sided facial weakness. *Id.* Petitioner's wife reported that his speech got worse when fatigued. *Id.* Dr. Malickel found that Petitioner had a decreased right nasolabial fold and decreased deep tendon reflexes in his extremities. *Id.* at 2.

Petitioner submitted a declaration dated April 28, 2022. Petitioner emphasized that his lumbar puncture took nine attempts and was extremely painful. Ex. 9 at 1; Ex. 5 at 33. Petitioner explained that he was only able to leave Encompass after a short time because his wife is a nurse and could assist him at home. Ex. 9 at 2. After his hospitalization, Petitioner experienced ongoing pain in his extremities and some speech impairment, which made it difficult to talk to his clients after returning to work. *Id.* Petitioner was out of work for one month. *Id.* As of the date of his declaration, Petitioner stated that most of his symptoms were gone, but he still had some tingling in his fingers and toes, blurry eyes/tearing, and pain in his hip. *Id.*

Petitioner filed a supplemental declaration on September 16, 2024. Petitioner stated that although he had made "significant improvements," and had "mostly recovered," he was still not "back to baseline." Ex. 12 at 1. He also stated that he had a

routine physical in April 2024 with Dr. Malickel and reported to Dr. Malickel that he still experienced tingling in his fingers and toes. *Id.*

As explained at the August 22, 2025 hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. Special masters look to the general landscape of past pain and suffering awards, and specific past reasoned decisions relevant to a claimant's own circumstances. That information, when offered by the parties, can be highly useful in guiding my award (although a petitioner's personal experiences in dealing with a vaccine injury are always the foundation of the award ultimately issued).

In his brief, Petitioner argues that his past pain and suffering warrants an award of $185,000.00, based on comparison to the prior reasoned decisions of *Fedewa* and *Johnson*.[6] Pet'r Brief at 13-14. In both of those cases, claimants were awarded damages for past pain and suffering in the amount of $180,000.00. Petitioner argues that the length of his treatment and types of interventions that he received were similar to or more severe than in *Fedewa* and *Johnson. Id.*

Respondent seeks a significantly lower award no more than $85,000.00. Respondent does not provide any case citations in support of this specific amount, but argues that this case is more akin to *Granville*,[7] in which $92,500.00 was awarded for past pain and suffering. Resp't Br. at 10-11. According to Respondent, the medical records demonstrate that although Petitioner had a longer hospitalization and in-patient rehabilitation than in *Granville*, he recovered quickly and did not need substantial out-patient PT. *See id.*

I find that this case is not sufficiently similar to *Fedewa* and *Johnson* to merit an award in that higher range. Petitioner's reliance on these cases appears to be based on a facial comparison of the number of days of hospitalization/rehabilitation and types of tests and treatment received. *See* Pet'r Br. at 13-14. However, Petitioner ignores the overall greater severity of symptoms experienced by the *Fedewa* and *Johnson* petitioners.

Petitioner highlights that the *Fedewa* petitioner was hospitalized for eight days followed by five days of inpatient rehabilitation, experienced a traumatic lumbar puncture

---

[6] *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) and *Johnson v. Se'cy of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018).

[7] *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 64413388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

and EMG, and received a five-day course of IVIG. *Id.* Petitioner also suggests that his inability to work for one month is similar to that claimant being unable to work for three months. *Id.* However, there is a large disparity with *Fedewa* for PT services received. Petitioner only needed two PT sessions after discharge from in-patient rehabilitation, but the *Fedewa* petitioner participated in 22 outpatient PT sessions.

Petitioner also does not acknowledge that the *Fedewa* petitioner had limitations to his physical capabilities and difficulty functioning for a year and a half. By contrast, Petitioner reported being at 95% within two to three months. Ex. 4 at 16. Further, the *Fedewa* petitioner developed depression and anxiety and experienced negative effects on his family and social life for two and a half years, which Petitioner did not report. Although Petitioner has not been not totally symptom-free in that he still has tingling in his extremities and had mild facial weakness for some time, his residual symptoms were not as severe as in *Fedewa*.

With regard to *Johnson*, Petitioner notes that he had a longer inpatient stay because that petitioner was hospitalized for five days without any in-patient rehabilitation. *See* Pet'r Br. at 14. The *Johnson* petitioner also received a lumbar puncture and a five-day course of IVIG. However, Petitioner does not discuss that the *Johnson* claimant had more serious limitations on her mobility for a longer period of time. Even though she was not admitted to rehabilitation, she had not recovered at the time of discharge and had difficulty walking for months. Like in *Fedewa,* the *Johnson* petitioner was also limited in her ability to perform her two jobs for a long period of time and experienced incontinence, fatigue, and numbness in her legs for over two years after vaccination.

Respondent is therefore correct that these other petitioners "experienced unique residuals not seen in this case." Resp't Br. at 10. Even though Petitioner did have a frightening and painful experience, I do not agree with Petitioner's characterization that he suffered a dramatic, severe, extensive, and debilitating injury. *See* Pet'r Br. at 8, 11; Pet'r Reply at 1. Petitioner had a serious acute phase but then recovered well. There is no basis for awarding Petitioner even more damages than the $180,000.00 awarded in *Fedewa* and *Johnson*.

However, Respondent's proposal of not more than $85,000.00 is far too low for this set of facts. The *Granville* claimant was admitted to the hospital for five days and received one course of IVIG, but retained her ability to walk and did not need inpatient rehabilitation. After she was discharged, that petitioner was almost immediately independent and performing full work duties and daily activities without problem by two months post-discharge. Petitioner did recover relatively quickly, but the acute phase of his illness was certainly more severe than in *Granville.*

7

Although neither party discussed my previous decision in *Weil*, awarding $140,000.00 in past pain and suffering, I find it to be very comparable to the instant case.[8] That individual was admitted to the hospital for five days and had one round of IVIG, an MRI, and a lumbar puncture. The *Weil* petitioner then spent 20 days in inpatient rehabilitation. His strength and balance significantly improved during that time, although he still had some mobility issues at discharge. He then attended seven outpatient PT sessions in the next month. Within two months of the start of that petitioner's hospitalization, he reported being nearly back to baseline, with some lingering numbness and imbalance. He continued to report mild residuals but did not require any further treatment.

I explained in *Weil* that pain and suffering awards in the range of $170,000 to $180,000 typically "involve more severe GBS, and where the injured parties experienced far worse prognoses subsequent to their initial hospitalizations and could no longer work (or were out of work for several months), attended far more physical therapy visits, and continued to require medication for pain specifically related to the GBS." Nonetheless, GBS is a "serious and frightening vaccine injury" and generally results in some residual sequelae. As in *Weil*, to balance the severity of a GBS injury and Petitioner's painful personal experience against his overall moderate disease course and treatment requirements, I find it appropriate to award $140,000.00 for past pain and suffering in this case as well.[9]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum payment of $142,344.98 ($140,000.00 for past pain and suffering, $268.78 for unreimbursed expenses, and $2,076.20 for lost wages) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

---

[8] *Weil v. Sec'y of Health & Hum. Servs.*, No. 21-831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Feb. 6, 2023).

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.